(35 Misc. Rep. 235.)

DICKINSON v. EARLE et al.

(Supreme Court, Special Term, New York County.  June, 1901.)

1. REFEREE—REPORT—FRAUDULENT CONTRACT.
    Where a referee makes a bargain with a stenographer, upon a reference to him, for a share of the fees payable to the stenographer, the report of the referee will be set aside, as such contract is a fraud on the parties.

2. SAME—FEES.
    Where the amount of the fees of a referee has been left open at the commencement of the case, and after the case was closed he attempts to have his fees fixed by stipulation at $20 for each hearing, adjournment, or day of deliberation, and one party refuses to sign the stipulation, and thereafter he reports in favor of the party who signed the stipulation and paid the fees, the report will be set aside.

Action by Charles C. Dickinson, assignee, against Eugene M. Earle and others. Motion to set aside referee's report and vacate a judgment entered thereon, and for an order appointing another referee to hear and determine. Granted.

Affirmed in 71 N. Y. Supp. 227.

H. D. Luce, for plaintiff.
Truax & Crandall, for defendant Eugene M. Earle.
Cardozo Bros., for defendant W. Pell Earle.

FREEDMAN, J. This is a motion for an order vacating and setting aside the referee's report herein, filed March 30, 1901, and vacating a judgment entered upon said report, and directing the clerk to cancel the docket thereof, by reason of the acts of the referee, and for an order appointing another referee herein to hear, try, and determine the issues in this action. This motion is based upon acts of alleged misconduct on the part of the referee appointed to hear and determine and fix the amount of compensation and expenses which should be allowed the plaintiff herein as assignee of the defendants. The commission of the acts charged is not denied. In fact, an affidavit made by the referee on an appeal taken by him

from a taxation of his fees is made a part of the moving papers on this motion, in which affidavit he substantially admits the offenses of which he is accused, and shows an entire unconsciousness of the ethics of his profession, and a total disregard of the consequences of his improper conduct. The history of the litigation in this action, with its interruptions, adjournments, and expenses, has been gone into at considerable length by the respective parties herein, each side charging the other with the practice of dilatory tactics; but, for the purpose of the determination of this motion, a reference to only a portion thereof need be made.

The referee herein was appointed on May 26, 1898. A long and bitter litigation ensued. Nearly three years were taken up in hearings had at various times. At the first hearing before the referee the plaintiff's attorney proposed that a stipulation be entered into to the effect that the referee might fix the amount of his own fees. The attorney for one of the defendants suggested that any such stipulation would be without legal effect, unless the per diem compensation was stated therein. A stipulation was finally dictated and entered in the minutes, but not signed by any of the parties, to the effect that the referee might fix such fees for himself as might be reasonable, and in so doing should not be limited to the statutory fees; no mention being made of any per diem charge. After the testimony was all taken and submitted to the referee for his decision, and before such decision was rendered, he called at the office of one of the defendants' attorneys and presented a written stipulation fixing the amount of his fees at the sum of $20 per day for each day spent on the hearing and in the examination of the case and of briefs of counsel, and for each adjournment. When this stipulation was so presented, the referee stated that the plaintiff's attorney was willing to sign it. The defendants' attorneys refused to sign such stipulation. On March 30, 1901, the referee filed his report, in which he fixed the amount of his fees at the sum of $5,180. He made oath, upon the taxation of the costs herein, that there were 97 days on which evidence was taken and 68 adjournments, and that in examining the testimony and the briefs of counsel and preparing his report he spent 94 days. For this total of 259 days he charged $20 per day. It appears that the plaintiff consented to, and paid the referee, the amount claimed by him. The clerk subsequently reduced the amount to $10 per day, and upon an appeal from such reduction by the clerk the special term overruled the appeal; and Mr. Justice O'Gorman, before whom all the facts were laid, said, among other things, "The criticism of defendants' counsel that the fees charged were extravagant and exorbitant finds ample justification in the papers used on this motion." It further appears that thereafter, and some time in April, 1901, one of the defendants' attorneys met Mr. George A. Haynes, who had acted as stenographer during the latter portion of the trial, and in conversation with him learned, for the first time, of a secret understanding and agreement entered into and existing between the referee and the stenographers who had taken the testimony in the case, by which the referee was to, and did, receive a part of the

stenographers' fees. Under a stipulation between the parties, one-half of the stenographers' fees was to be paid by each party, as the trial progressed, and the payments of the prevailing party were to be taxed as part of the costs and entered in the judgment. The total amount of the stenographers' fees was $2,446.96. As to the fact that the agreement aforesaid was made, there is no question. Mr. Haynes, who refused to sign or verify an affidavit stating the facts as to such agreement, was ordered to appear before a referee appointed for that purpose, and his deposition was taken. This deposition not only establishes the truth of the existence of such an agreement, but the payment of the referee's portion of such fees by checks sent the referee, and also a letter from such referee demanding his share of said fees. Haynes testifies that the stenographer first employed, who is now dead, was a man named Copp; that Copp became ill and unable to attend the trial; that he (Haynes) was employed as a substitute; that when he first saw the referee the latter said, "I suppose you know the understanding between Copp and me;" and that he (Haynes) replied he "knew of no understanding." The conversation that ensued is stated in said deposition to have been as follows:

"The referee said, 'Well, Copp gives me one-third of his fees.' Q. What did he say he wished you to do in the matter? A. I said, 'I cannot do any such thing as that.' That is a thing I would not think of doing. I never paid a referee any commission at all. * * * Q. What was the amount he stated? A. One-third of the stenographers' bill. Q. Did you subsequently make an arrangement with Mr. O'Brian about a share of your fees? A. I told him that I considered I was doing the case for Mr. Copp; I was taking his place; and that the best I could do in anything of that kind would be to allow Mr. Copp, or whoever represented him, one-third of the first copy. * * * Q. And now, so that the court may understand, what is meant by 'one-third of the first copy'? A. The first copy in a case is charged at the rate of twenty-five cents a folio. The second or subsequent copies are charged at the rate of five cents a folio. I told Mr. O'Brian that I would allow him, or at least Mr. Copp, because I could not consider myself as allowing anything to a referee, one-third of the first copy only, and nothing further than that. Q. What did Mr. O'Brian say? A. He said, 'All right, then, if that is the best you can do, we will settle it at that.' * * * Q. Did he say this, 'That, if you were employed, he would expect you to do the same as the other stenographer had done'? A. Oh, he made that very plain. Q. And gave you to understand that you would not get the job unless you did so? A. Oh, yes; he made that very plain."

Nor is this all the testimony bearing on that subject. A portion of the affidavit before referred to, made by the referee, and used on the motion for a retaxation of his fees, is as follows:

"That he is the referee duly appointed in the above-entitled action, to hear, try, and determine the same. That some time previous to deponent's appointment as referee in this action he was appointed referee in another matter. That one Samuel Watters was in the office with deponent in the Mail & Express Building, 203 Broadway, and, knowing of this reference, said to deponent that he knew of a good stenographer,—one who would do good work, and 'would be willing to give up a portion of his fees.' That thereupon deponent said to Watters, 'Send the man to me.' That thereafter a gentleman came to deponent and introduced himself as a Mr. Copp, the stenographer referred to by the aforesaid Watters. That, after some talk about the amount of work there might be in the reference (not, however, this reference), the said Copp then said to deponent relative thereto, 'I will allow

you one-third of my fees.' Afterwards, and upon being appointed referee in this case, Mr. Copp commenced to take testimony in this case, and continued until he was unable longer to do so because of ill health. He then informed me that he would send to me Mr. Haynes, a competent stenographer to go on with the work. He further said that he had or that he would explain to Mr. Haynes the arrangement between him and deponent, and would get Haynes to consent thereto. That, at the hearing following in this case, Mr. Haynes appeared and took testimony. At the end of the hearing, or some time afterwards, deponent asked Haynes if Mr. Copp had told him of the arrangement between him and deponent, to which Mr. Haynes replied he had not, or that in substance. He said further that he wanted to know whether or not he was to continue taking testimony in the case, regardless whether or not Mr. Copp's health would permit him to return. Deponent then said to him that, owing to Mr. Copp's unfortunate condition, he did not think it wise to continue him again, lest he break down in health, and Mr. Haynes might consider himself the stenographer in the case until the finish, as under no circumstances would deponent reinstate Mr. Copp, because of his fear that he might again collapse. Then Mr. Haynes said, 'What was the arrangement that you had with Mr. Copp?' Deponent replied to that, that Mr. Copp had, without any solicitation on the part of deponent, agreed to give deponent one-third of his fees. Then Mr. Haynes said, 'Well, as long as I know I am to be stenographer in the case, I will give one-third.' Deponent further says that at no time or place did he say to Mr. Haynes that, unless he consented to the arrangement that had been made between deponent and Mr. Copp, that he (Haynes) could not act as such stenographer."

This agreement was fulfilled. From time to time Haynes paid the referee his stipulated proportion of the fees. One check of $100 was produced and annexed to the deposition, and upon the occasion when the defendants had paid their share of the stenographers' bill in full the referee wrote the following letter:

"My Dear Haynes: Congratulations. Am damned hard up. Wish you would send me check indorsed correct as to indorsement. I make 8,137 folios, at 8⅓, $511.08, of which I have had $296, leaving $215.08. Send me check, so that I get it to-morrow morning.

"Yours, sincerely,                                    M. O'Brian."

As testified to by Mr. Haynes, the cause for the congratulations with which the foregoing letter opens was the receipt by Haynes of the final payment that was due on his bill from the defendants.

Although the referee denies that he ever suggested to either of the stenographers that they should pay him any portion of their fees, such denial has but little bearing upon the main question involved herein, and, in view of his own sworn statement that he actually sought for a man whom he had been told "would be willing to give up a portion of his fees," that he directed his informant to "send me the man," and the proof of the receipt by him of over $500 paid by Haynes out of the fees paid to Haynes, such denial is worthy of but little credit. The plaintiff herein does not in any way attempt to defend the referee in this most extraordinary conduct. He gives a long history of the case, states the large amount of expense already incurred, and the additional time and expense a new trial would entail, and claims that he is innocent of wrongdoing, and that the fact that the stenographers made a private arrangement for giving the referee a share of their fees should not affect the legal rights of the plaintiff, and that such agreement has had no effect upon the rights and interests of the litigants, nor influenced the action of the referee in any way. There can be no

question but that this litigation has been long, costly, and vexatious, and that a new trial will cause delay and additional expense; but all the reasons urged by the plaintiff as grounds for refusing to grant the relief asked for by this motion shrink into comparative insignificance when we consider the other side of the question. Here is a sworn officer of the law, who stands pro hac vice as judge of this court, and makes a bargain at the beginning of a case with the stenographer for a share of the fees to be paid for copies of the testimony. That such an agreement constitutes wrongdoing on the part of the referee, tends to unduly prolong the reference, contributes towards the admission of irrelevant and immaterial evidence, casts suspicion upon the fairness and impartiality of the referee, and is a fraud and an imposition upon the parties, needs no argument. Such a pernicious and vicious practice cannot be permitted to go unnoticed. The reservation of a secret profit by one who occupies a trust position is recognized as an act of fraud, not only by the courts, but by all known standards of honor; and the courts cannot afford to exact a lower degree of fidelity and a lesser standard of honor in one of its officers who has been authorized to sit in the capacity of a judge, merely because it will create additional expense by a refusal to indorse such behavior.

The plaintiff says in his brief that this is a pioneer case, that there are no cases reported in the books that parallel the question here submitted, and that, in all cases in which a referee's report has been set aside, it has been upon the ground of misconduct by the referee with one of the parties, or improper claims or demands made by the referee with reference to his report. Hoping and assuming that this is the first case of this character upon record, a reference to a few cases involving the same general principle will show the manner in which the courts have heretofore decided questions of this nature, viz:

"The question here was not whether the referee was guilty of actual corruption, but whether the fairness of his decision was justly questioned. It is the set law of this state that any indiscreet action of a referee, from which improper inferences can be drawn, suffices to set aside his report."

Reynolds v. Moore, 1 App. Div. 106, 108, 37 N. Y. Supp. 72; Yale v. Gwinits, 4 How. Prac. 253; Dorlon v. Lewis, 9 How. Prac. 4; Roosa v. Road Co., 12 How. Prac. 297; Greenwood v. Marvin, 29 Hun, 99; Carroll v. Lufkins, Id. 17; Burrows v. Dickinson, 35 Hun, 492; Livermore v. Bainbridge, 14 Abb. Prac. (N. S.) 227.

In Roosa v. Road Co. the court said:

"But it is scarcely less important that the conduct of those to whom its administration is intrusted should be such as to furnish those who litigate no just grounds for suspicion."

In the case of Leonard v. Mulry, 93 N. Y. 392, the referee, after filing his report, entered into an agreement with the successful party whereby his fees were to be paid out of the proceeds of the judgment when collected. It was held that this was ground for vacating his report, since it disqualified him from settling the case, and gave him an interest in the outcome. The court, in writing the opinion, says, among other things:

"He might be affected by it unconsciously, and the rule of exclusion has regard not so much to the motives which in any given case may be supposed to bias the judge, as to the apprehensions or even the overanxious suspicions of litigants, and the preservation of confidence in the administration of justice."

To the same effect is the decision in the case of Fortunato v. City of New York, 31 App. Div. 271, 274, 52 N. Y. Supp. 872.

Nor should this referee escape censure for the course pursued by him in endeavoring to have the amount of his fees agreed upon by the attorneys for the respective parties. After the case was closed and the evidence submitted to him for decision, he lays before the defendants' attorneys a stipulation fixing his fees at $20 per day, not only for every session, but for every adjournment, and a large number of days claimed by him to have been spent in consideration of the case. He couples with his demand a statement that the attorney for the plaintiff is willing to, and does, approve of such a stipulation. Upon a refusal by the defendants' attorneys to sign the agreement, a report is made in favor of the party who has approved of it, and the fees charged therein are paid by the plaintiff at the rate of $20 per day for hearings, consideration, and adjournments, —hearings of 97 days, 68 adjournments, and 94 days in examination of testimony and preparing report. It is true that an agreement was entered upon the minutes at the commencement of the trial that the referee should not be limited to his statutory fees, but might make such a charge as was reasonable therefor; but it cannot with reason be said that such stipulation contemplated the charge for every adjournment, at the same compensation as for days spent upon the hearings, nor did it contemplate the extraordinary charge for about 94 days spent in the examination of testimony taken at only 97 days of hearings. Such stipulation so entered as aforesaid furnishes no excuse for the conduct of the referee, nor for making what Mr. Justice O'Gorman justly characterizes as "extravagant and exhorbitant" charges. These acts of the referee can hardly be distinguished from those in the case of Greenwood v. Marvin, 29 Hun, 99. In that case the referee, after the case had been closed and submitted to him, and before he had decided it, applied to the parties and their attorneys, orally and by letter, to have his fees fixed at a sum in excess of the sum which he would have been entitled to receive, if they were determined by the statutory rates, and sought to procure the execution of a stipulation to that effect. The plaintiff and one defendant seemed willing, while the other defendant refused, to execute it. Subsequently the referee notified the defendant who had expressed a willingness to execute the stipulation that he would deliver the report to him on receipt of a sum greater than the statutory fees. Thereafter a bond and mortgage were given the referee by said defendant and his son to secure said fees, and the report was delivered to him. It was claimed that the referee had expressed an opinion favorable to the defendant against whom he finally decided. It was held that the court properly set aside the report and the judgment entered thereon. In the opinion the court says:

"The policy of the law in guarding judicial trials from evil, and appearance of evil as well, requires that such conduct as has been disclosed should be condemned, and that a report following such conduct should be set aside, and the parties remitted to another trial. Confidence in the purity of the administration of the law cannot be maintained if such conduct be tolerated, and reports allowed to stand, made by referees who start negotiations and stipulations for extra statutory fees after a case has been submitted to them. Referees ought, like jurors, to be vigilant to avoid evil; to avoid taking a line of conduct which may affect their freedom of mind and neutrality in the cases under consideration. Ex parte treaties and conversations with either party as to any fact, point, or fee ought to be avoided. Suitors have a right to an unbiased tribunal approaching the delicate duty of determining the facts and the law in a case uninfluenced by any solicitude or efforts to secure extra fees."

It is clear that courts have ever been ready to guard the rights of parties, to protect their interests, and to promptly resent any improper or even suspicious conduct on the part of referees. The principle involved is the preservation of the purity and integrity of justice, as administered by the courts, and the maintenance of the rectitude and dignity of its officers. The fact that the plaintiff has actually paid the full amount of the referee's fees has no force. The courts have made provision for his relief in a case of this kind. Duhrkop v. White, 13 App. Div. 295, 43 N. Y. Supp. 190. To sustain this judgment would be equivalent to notifying every referee that he is at liberty, by extortionate demands and secret reservations, to enrich himself at the expense of the litigants. The relief as asked for by this motion is granted.

Motion granted.